# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                                                                                                                            No. 1:19-cr-413 WJ

BENEDICTO RIOS,

    Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

THIS MATTER IS BEFORE THE COURT on Defendant Benedicto Rios' ("Defendant's") Motion to Suppress Evidence and Statements ("Motion") (**Doc. 24**). The Court, having reviewed the parties' briefing and considered counsels' oral arguments and the applicable law, finds that the Motion is not well-taken and is, therefore, **DENIED**.

## BACKGROUND

This case arises out of Defendant's arrest by Lance Cerros and other officers of the Albuquerque Police Department ("APD") inside of a Kohl's store on December 28, 2018. Defendant is charged with being a felon in possession of a firearm. Defendant moves to suppress the firearm and all other evidence obtained to support this charge on the grounds that the police lacked reasonable suspicion to detain him and/or probable cause to arrest him.

At the hearing on this matter, the following events were established. Officer Cerros testified that he has been a law enforcement officer since 2008. Officer Cerros estimated that he has responded to 500 or more shoplifting calls for service. Based on his knowledge, training, and experience, he knows that shoplifters often carry weapons. In fact, Officer Cerros testified that

ninety percent of the shoplifters he encounters are armed with some kind of weapon. On the evening of December 28, 2018, Officer Cerros was working patrol when he spotted a Toyota idling with its trunk open outside of the fire/rear exit of the Home Depot store near Cottonwood Mall in Albuquerque, New Mexico. Officer Cerros believed this was consistent with a "push out," a situation where shoplifters will use a back exit to take merchandise from a store into a waiting getaway vehicle. Officer Cerros recorded his interaction with the driver on his lapel camera, which was played at the hearing. He can be heard on the video asking the driver if he is staging a push out. The driver denied this and told Officer Cerros that he did not have any identification on him. Officer Cerros then asked the driver to step out of the vehicle, at which point the driver sped off, nearly colliding with another driver. Officer Cerros was unable to locate the vehicle and returned to Home Depot where a call for service was pending.

That call for service came from Home Depot's store manager. He had contacted police regarding six individuals who had previously been issued criminal trespasses (meaning they were not permitted to be at the store). An audio recording of that call was presented at the hearing. The manager relayed to the APD operator that he believed the individuals were about to steal from the store. The manager further stated that he had a "funny feeling" that there was probably a car waiting in the back of the store. When Officer Cerros arrived he made contact with the store manager. At this time, there were multiple officers on scene. The officers, including Officer Cerros, and store employees were standing in the parking lot of the store. Officers received information that two of the subjects had left the store in a Mustang. Officer Cerros once again left Home Depot and pulled the Mustang over nearby. This encounter was also captured by lapel camera. Officer Cerros made contact with two male subjects (driver and passenger) who denied having been issued criminal trespasses, with one somewhat humorously stating that he had not

2

ever "been caught" at Home Depot. After briefly speaking with the individuals, one of whom was an admitted parolee, Officer Cerros sent them on their way.

Officer Cerros, believing his investigation was concluded, disengaged his lapel camera and went back to the parking lot of Home Depot. When he returned to Home Depot, an employee (who Officer Cerros could not identify) told him that another subject, a Hispanic male wearing a red sweatshirt and black hat, had run out of the store heading towards the nearby Wal-mart. Officer Cerros did not have his body camera engaged during this exchange. Although not viewed by Officer Cerros that evening, surveillance video from the Home Depot shows a man, later identified as Defendant, walking out of the store wearing black pants, a black jacket, a black and red beanie, and a red scarf. (*See* Gov.'s Ex. 1.)

After receiving the report from the store employee, Officer Cerros got back in his car and went in search of the person the employee had described. He was then contacted by another officer who had spotted someone matching the description offered by the employee walking toward a furniture store near the Wal-mart. Officer Cerros advised the other officer that he thought perhaps the subject would lead them to the Toyota which fled earlier, so Officer Cerros drove to the area. He then personally observed the subject–later identified as the Defendant–walk into Kohl's.

Officer Cerros entered Kohl's from a different entrance than Defendant and immediately went into the store's loss prevention office, which he was familiar with from other service calls. Although there were multiple cameras, Officer Cerros was watching Defendant from one in particular. Officer Cerros observed Defendant speaking with someone in the store. He then observed Defendant retrieve a Kohl's plastic bag from an employee at one of the registers. The video shows that Defendant was holding something underneath his arm, and had a black jacket tied around his waist. Officer Cerros then watched from the store's surveillance camera as

3

Defendant moved away from the cash registers without paying and then walked toward a clothing display. Officer Cerros' view was partially obstructed by a large pillar, but he could see that Defendant was putting items into the bag. Defendant then walked out of the store into a vestibule area.

Upon seeing Defendant place unknown items into the bag and walk out of the store without returning to the cash registers or paying, Officer Cerros left the loss prevention area and returned to his police vehicle where he planned to intercept Defendant by driving around the building toward the exit Defendant went through. When Officer Cerros pulled up, he engaged his body camera and could see Defendant in the vestibule. Defendant proceeded to head back inside the store.

When Officer Cerros entered Kohl's, Defendant was standing near the cash registers, swinging a Kohl's bag.[1] Officer Cerros asked to speak with Defendant who replied "sure" and then began following Officer Cerros toward the exit. Defendant asked, "can I talk to my grandma real quick?" to which Officer Cerros replied, "no–hold on man." Officer Cerros walked into the vestibule with Defendant following closely behind but still outside of the interior door to the vestibule. Officer Cerros then asked, "do you have any weapons on you?" Defendant responded, "what's that?" Officer Cerros repeated the question and Defendant replied "no–let me tell my grandma." Officer Cerros then reached out for Defendant's arm and said "hey come here" to which Defendant replied, "what am I doing? I don't understand what I did wrong." Officer Cerros stated, "I need to talk to you about this merchandise right here." Defendant stated the merchandise was his. Officer Cerros asked Defendant if he had a receipt. At this point, another officer (Officer Aragon) can be seen on Officer Cerros' lapel footage holding Defendant's arm. Defendant stated,

---

[1] This portion of the factual narrative is the Court's description of Officer Cerros' lapel camera, which was played in court at the hearing as part of Government's Exhibit 1. The following occurred over a period of less than one minute.

"you can ask that lady she just gave me one" and motioned with his chin toward the cash registers. Officer Cerros told Defendant that he needed to make sure that Defendant did not have any weapons on him. While Officer Aragon was still holding Defendant's arm, Officer Cerros began a pat-down of Defendant. While conducting the pat-down, Officer Cerros either felt or saw something and stated, "oh he has a gun." Defendant immediately began struggling against the officers. Officer Cerros stated "do not reach for that gun!" as the officers struggled with Defendant. Eventually, Defendant was taken to the ground by officers in the struggle, and subsequently arrested. The officers later established that the items in the bag belonged to Defendant and were not shoplifted from Kohl's.

Defendant avers that his encounter with Officer Cerros was an unlawful arrest not supported by probable cause. (Doc. 24 at 5.) The Government, in turn, contends that the encounter was merely an investigatory detention, requiring only reasonable suspicion.

## DISCUSSION

### I. The interaction between Defendant and Cerros was not a consensual encounter.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures [ ] shall not be violated." U.S. Const. amend. IV.

> In determining whether a seizure comports with the Fourth Amendment, courts have identified three categories of police-citizen encounters: (1) consensual encounters . . . (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity . . . and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (internal quotation marks and citation omitted). The Fourth Amendment is not implicated when an encounter between a citizen

and the police is consensual. *See United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990). The touchstone of a consensual encounter is whether a reasonable person would feel free to walk away from the encounter. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Florida v. Bostick*, 501 U.S. 429, 439 (1991) (explaining the determination of whether a seizure has occurred turns on "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter"). If a reasonable person would believe he is not free to leave, the encounter constitutes a seizure for purposes of the Fourth Amendment. *Id.* Additionally, what starts as a consensual encounter "can be transformed into a seizure or detention within the meaning of the Fourth Amendment" when a reasonable person would no longer feel free to leave. *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215 (1984); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) (explaining that a seizure occurs "when the officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement) (internal quotation marks and citation omitted).

The Court will not belabor its analysis on this point. The moment Officer Cerros told Defendant, "no–hold on man," in response to Defendant stating that he wanted to tell his grandmother where he was, a reasonable person would not have felt free to leave. *See United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (explaining that a seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen"). Although Defendant initially replied "sure" when Officer Cerros asked to speak with him, Defendant terminated his consent when he started to walk away and said that he wanted to talk to his grandma. At that point, what started as a consensual encounter turned into a seizure

for purposes of the Fourth Amendment. As such, this matter turns on whether the interaction was an investigatory detention or an arrest.

> II. **Although not a consensual encounter, the interaction was merely an investigatory detention and was supported by reasonable suspicion.**
>
> A. **Arrests versus Investigatory Detentions (*Terry* Stops)**

The Constitution does not forbid all searches and seizures, only searches and seizures which are unreasonable. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968) (internal citation omitted). "The Supreme Court [has] held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Perdue*, 8 F.3d 1455, 1461 (10th Cir. 1993) (citing *Terry*, 392 U.S. at 21). When reasonable suspicion supports a temporary investigative detention, commonly known as a *Terry* stop, police officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo." *United States v. Hensley*, 469 U.S. 221, 235 (1985). While *Terry* stops are normally non-intrusive, the Tenth Circuit has held "that law enforcement may (1) display some force, (2) place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause." *Cortez v. McCauley*, 478 F.3d 1108, 1130 (10th Cir. 2007) (citing *Perdue*, 8 F.3d at 1463). When law enforcement uses an unreasonable level of force, a *Terry* stop is transformed into an arrest. *Shareef*, 100 F.3d at 1507 (10th Cir. 1996). An arrest "is characterized by highly intrusive or lengthy search or detention," and must be supported by probable cause. *See Oliver v. Woods*, 209 F.3d 1179, 1185 (10th Cir. 2000).

Defendant argues that from the moment Officer Cerros placed his hands on Defendant and told Defendant he could not go speak with his grandma an arrest occurred, because that show of force elevated the interaction from a *Terry* stop to arrest. Defendant contends that officers were

7

acting on mere hunch and that "forcibly" detaining him was "highly intrusive and "tantamount to an arrest." (Doc. 24 at 7.) The Court disagrees. Beginning with *Terry*, appellate courts have long held an officer may conduct a pat-down during the course of a valid investigative detention if the officer "harbors an articulable and reasonable suspicion that the person is armed and dangerous." *See, e.g., United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). "The purpose of the limited pat-down search is not to discover evidence of a crime, 'but to allow the officer to pursue his investigation without fear of violence.'" *United States v. Manjarrez*, 348 F.3d 881, 886–87 (10th Cir. 2003) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972). That is precisely what happened here.

Here, Officer Cerros testified that he has responded to over 500 shoplifting calls for service and that ninety percent of the time, the suspect is armed. As such, based on his training, experience, and common sense, it was reasonable for Officer Cerros to believe that Defendant likely was armed and that a pat-down was necessary for officer safety. Moreover, the minimal force displayed by the officers, *i.e.,* holding Defendant by the sweatshirt and his arm, was not unreasonable, nor did it elevate the investigatory detention into an arrest. *See Gallegos v. City of Colorado Springs*, 114 F. 3d 1024, 1031 (10th Cir. 1997) (explaining that even the use of handcuffs or forcing a suspect to the ground do not automatically transform a detention into arrest).[2]

---

[2] Defendant does not appear to challenge the additional force used by the officers once Defendant began struggling against them after Officer Cerros stated, "he has a gun." Even assuming Defendant made that argument, the Court concludes that the additional force applied by officers was the result of Defendant struggling and reaching toward his waistband in what the officers justifiably believed to be an effort to get to the concealed gun. Under the circumstances, additional force used by the officers to protect their safety and that of others in the store was reasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry*, 392 U.S. 22–27) (explaining that physical force may be used to effectuate a seizure).

8

### B. Reasonable Suspicion

Having determined that the challenged interaction between Officer Cerros and Defendant was a *Terry* stop and not an arrest, the Court rejects Defendant's probable cause arguments and focuses on whether the *Terry* stop was justified by reasonable suspicion.

Reasonable suspicion is determined under the totality of the circumstances. *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). Police officers may not act on a mere hunch; they must have "a particularized and objective basis for suspecting an individual may be involved in criminal activity" in order to justify a *Terry* stop. *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013). In analyzing whether reasonable suspicion exists, courts are instructed to consider "whether the facts available to the officer at the moment of the seizure or the search [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* (citing *Terry*, 392 U.S. at 22). Additionally, "when determining if a detention is supported by reasonable suspicion, we defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions," and "judge the officer's conduct in light of common sense and ordinary human experience." *McHugh*, 639 F.3d at 1256 (internal quotation marks and citation omitted).

Here, the Court has no trouble concluding Officer Cerros had reasonable suspicion to support his *Terry* stop of Defendant. The information available to Officer Cerros in Kohl's alone was sufficient to support the stop. Defendant argues that his behavior in the Kohl's store, from the perspective of the officers, was "unambiguous" and not cause for suspicion. (Doc. 24 at 8.) But what Officer Cerros witnessed was the Defendant on a store surveillance camera retrieve a bag from a store employee, walk to an area of the store where merchandise was displayed, put something in the bag, and walk past the point of sale without paying. If anything, although in the

end it turned out to be innocent, Defendant's behavior at the time of the officer's observation was "unambiguously" consistent with shoplifting. In fact, during closing arguments at the suppression hearing, the Court commented on the record that upon viewing the surveillance camera video for the first time and seeing what Officer Cerros witnessed, the Court thought that Defendant had shoplifted items from Kohl's when he left the store. Accordingly, the Court has no difficulty finding that Officer Cerros was justified in conducing the *Terry* stop.

Additionally, even assuming for purposes of argument that Defendant's conduct in Kohl's, by itself, is not a sufficient basis for reasonable suspicion, the totality of the circumstances from the evening is certainly more than sufficient. Officer Cerros encountered a person he believed was acting as a getaway driver outside of Home Depot who fled recklessly from the scene. Officer Cerros is then summoned to Home Depot regarding a group of suspicious individuals who had previously been banned from the property. An employee reports to Officer Cerros a description of a person running out of the store toward Wal-mart which is not far from Kohl's. A person matching that description–Defendant–is seen in the vicinity and spotted entering Kohl's. These facts, in connection with Defendant's behavior in Kohl's, when considered in totality, offer a reasonable basis for Officer Cerros to have concluded that criminal activity might be afoot, warranting further investigation.

Defendant takes exception to the Home Depot employee's description of Defendant, arguing that it was factually impossible given that the description–Hispanic male, *red* sweatshirt, black hat–only matches Defendant *after* he left Home Depot and not while he was *in* Home Depot, where surveillance shows he was wearing a *black* jacket, red and black beanie, and a red scarf. However, Officer Cerros testified that it is not uncommon for eyewitness descriptions to be slightly inaccurate, focusing only on key points like a distinctive color. And, the Court observes that the

scarf Defendant was wearing in Home Depot was bright, distinctive, and . . . red. Moreover, Defendant was wearing a black jacket tied around his waist. As such, the employee's description and what Defendant was actually wearing while in Home Depot are not entirely irreconcilable as Defendant argues. In any case, any purported discrepancy is inconsequential because, as noted above, Defendant's actions in Kohl's alone, entirely unconnected to the events which unfolded at Home Depot, justified the *Terry* stop.

Defendant also takes issue with the nature of Officer Cerros' investigation, arguing that Officer Cerros should have more thoroughly investigated the individuals he stopped in the Mustang, particularly the parolee, and that he should have watched more surveillance footage and spoken to the store employees who were seen interacting with Defendant before approaching him. But Defendant cites no case law which requires law enforcement to conduct an exhaustive investigation before conducting a *Terry* stop. In fact, case law supports the contrary conclusion; an officer need not rule out the possibility of innocent conduct before conducting a *Terry* stop. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). Indeed, there can be reasonable suspicion "even if it is more likely than not that the individual is not involved in any illegality." *See United States v. Albert*, 579 F.3d 1188, 1197 (10th Cir. 2009) (internal quotation marks and citation omitted). As such, the Court rejects Defendant's arguments.

## CONCLUSION

The Court finds and concludes that the seizure in this case was an investigatory detention supported by reasonable suspicion. The force used by the officers did not elevate the detention into an arrest requiring probable cause.

**THEREFORE**, Defendant's Motion to Suppress (**Doc. 24**) is **DENIED.**

**IT IS SO ORDERED**.

_____
CHIEF UNITED STATES DISTRICT JUDGE